# In the United States Court of Federal Claims

No. 10-851T
(Filed: October 26, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| CHARLES P. ADKINS and JANE E. ADKINS, | * | |
| | * | Remand; Income Tax Refund; Theft Loss; |
| Plaintiffs, | * | IRC § 165; Treas. Reg. §§ 1.165-1, 1.165-8; |
| | * | Securities Fraud; Pump-and-Dump Scheme; |
| v. | * | Reasonable Prospect of Recovery; |
| | * | Arbitration; Restitution; Revenue Procedure |
| THE UNITED STATES, | * | 2009-20; Burden of Proof |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

John F. Rodgers, Alexandria, VA, for plaintiffs.

Mark A. Ryan, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiffs Charles P. and Jane E. Adkins are victims of a fraudulent investment scheme, and seek a refund of federal income taxes based on the losses they sustained due to the scheme. The court held a trial to determine whether plaintiffs properly claimed the theft loss deduction for the 2004 tax year, whether a small portion of the claimed theft loss is deductible, and the proper amount of plaintiffs' refund, if any. In a February 16, 2016 Opinion and Order, the court concluded that plaintiffs were not entitled to a theft loss deduction for the 2004 tax year. Plaintiffs appealed that decision to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). Concluding that this court misconstrued the regulation concerning the timing of a theft loss deduction, the Federal Circuit vacated the February 16, 2016 Opinion and Order and remanded the case for further proceedings.

After advising the court that no further factual development was required, the parties filed postremand briefs addressing how the case should be resolved in light of the construction of the regulation articulated by the Federal Circuit. The court has reviewed the parties' briefs and, as set forth below, concludes that plaintiffs are not entitled to a theft loss deduction for the 2004 tax year. Accordingly, plaintiffs' complaint must be dismissed.

# I. FACTS

This section contains the court's findings of fact as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims.[1]

Donald & Co. Securities, Inc. ("Donald & Co.") was a broker-dealer of securities registered with the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD"). JX 1;[2] JX 45. Donald & Co. was directly owned by a holding company, THCG, Inc., and indirectly owned by Star Cross, Inc. and Stephen A. Blum. JX 45. One of the brokers employed by Donald & Co. was Otto Kozak. JX 1. Mr. Adkins began investing through Mr. Otto Kozak in September 1997, when Mr. Otto Kozak was employed by E.C. Capital, Ltd., and continued to do so when Mr. Otto Kozak moved to GKN Securities Corp. in October 1998 and Donald & Co. in March 1999.[3] JX 91. Investment accounts were opened at Donald & Co. for Mrs. Adkins individually, and plaintiffs jointly, in late 1999. Id.

Unbeknownst to plaintiffs, Donald & Co. was operating a "pump-and-dump" scheme.[4] Jt. Stip. ¶ 1. Broadly speaking, the pump-and-dump operation was accomplished by Donald &

---

[1] The court derives some of these facts from the parties' Joint Stipulation of Facts ("Jt. Stip."), allegations admitted by defendant ("Compl." and "Answer"), and pertinent statutes and regulations. The remaining facts are derived from the transcript of testimony elicited at trial ("Tr.") and the exhibits admitted into evidence during trial ("PX," "DX," or "JX"). Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness.

[2] The parties stipulated that the allegations in the indictment—JX 1—are "true and accurate." Jt. Stip. ¶ 11.

[3] Mr. Adkins also dealt with Mr. Otto Kozak's brother, Robert Kozak. Tr. 430, 432 (C. Adkins). To avoid confusion, the court refers to the brothers by their full names.

[4] As defined by the SEC:

"Pump-and-dump" schemes involve the touting of a company's stock (typically small, so-called "microcap" companies) through false and misleading statements to the marketplace. These false claims could be made on social media such as Facebook and Twitter, as well as on bulletin boards and chat rooms. Pump-and-dump schemes often occur on the Internet where it is common to see messages posted that urge readers to buy a stock quickly or to sell before the price goes down, or a telemarketer will call using the same sort of pitch. Often the promoters will claim to have "inside" information about an impending development or to use an "infallible" combination of economic and stock market data to pick stocks. In reality, they may be company insiders or paid promoters who stand to gain by selling their shares after the stock price is "pumped" up by

Co. arranging to purchase large blocks of stock in various companies; encouraging its customers to purchase these stocks, artificially inflating the stocks' prices; and then, once the price of a particular stock was sufficiently inflated, selling the stock that it owned, resulting in gains for the company and, due to the subsequent decline in the stock price to a normal, uninflated level, losses for the company's customers. Id. ¶¶ 4, 12-46. Among the stocks involved in the scheme were five stocks for which Donald & Co. was a market maker; in other words, it held these stocks in its own account to facilitate trading in them. JX 1. These stocks, also referred to as "house stocks," consisted of Elec Communications Corp. ("Elec"),[5] The Classica Group, Inc. ("Classica"), MyTurn.com, Inc. ("MyTurn"),[6] Great Train Store Co., and Tera Computer Co. Id.; Jt. Stip. ¶¶ 16, 23, 30, 37, 44. Donald & Co. owned much of their house stocks via Odyssey Capital LLC, a holding company. Tr. 391 (C. Adkins); see also JX 1 (noting the existence of a proprietary trading account funded by Donald & Co. principals in the name of Odyssey Capital LLC and that Donald & Co. accumulated profits from its fraudulent scheme in Odyssey Capital LLC accounts at, among other places, Chase Manhattan Bank). Mr. Adkins learned of this fact in 2003 or 2004. Tr. 392 (C. Adkins).

Plaintiffs accorded Mr. Otto Kozak a high level of discretion to trade in their accounts. Jt. Stip. ¶ 8. Some of the trades executed by Mr. Otto Kozak for plaintiffs were done on margin, JX 91, in other words, using borrowed money. Mr. Otto Kozak also convinced Mr. Adkins to participate in a private placement offering of Vianet Technologies, Inc. ("Vianet") stock.[7] Tr. 122 (C. Adkins). On December 14, 1999, $30,000 was charged to Mr. Adkins's Donald & Co. account to purchase a subscription in the offering. Jt. Stip. ¶ 85; JX 91 at 1580. Then, on December 20, 1999, Mr. Adkins prepared a check for $45,000, made payable to Continental Stock Transfer & Trust Company, to purchase a subscription in the offering. JX 53 at 823. It is unclear to whom Mr. Adkins sent the check; at trial he testified:

> I sent the $45,000 in only to hear later—and I sent it to the attorney of record where you have to send the money. It doesn't go to the broker. It goes to the company and—at some point I guess it has to go to the company. So, again, I sent the check in to Otto [Kozak] and he submitted it . . . .

---

the buying frenzy they create. Once these fraudsters "dump" their shares and stop hyping the stock, the price typically falls, and investors lose their money.

SEC, Pump and Dump, https://www.investor.gov/glossary/glossary_terms/pump-dump (last visited Feb. 23, 2016).

[5] Elec was formerly known as Sirco International Corp. JX 91 at 1574.

[6] MyTurn was formerly known as Compu-Dawn Inc. Jt. Stip. ¶ 12.

[7] In his testimony, Mr. Adkins used the term "initial public offering." Tr. 122 (C. Adkins). However, the documentary evidence in the record reflects that Mr. Adkins was seeking to participate in a private placement offering. See JX 53 at 823; JX 66 at 1195-96; JX 69.

Tr. 122-23 (C. Adkins) (emphasis added).  The check cleared plaintiffs' bank account on January 6, 2000.  JX 53 at 822.

At some point, Mr. Adkins was advised that the private placement offering was oversubscribed.  JX 69.  Thus, in a January 25, 2000 letter prepared by Donald & Co. on its letterhead, Mr. Adkins requested that Vianet transfer the "funds [he] submitted as part of [his] subscription to [Vianet's] private placement offering" to an escrow account for use in Vianet's new private placement offering.  Id.  The record contains no evidence indicating whether the specified funds referred to the $30,000 charge or the $45,000 check.  With respect to the latter, the record does reflect that on December 20, 1999, Donald & Co. charged Mr. Adkins's account for $45,000 that it sent, via wire transfer, to plaintiffs' bank,[8] JX 91 at 1580, and that there was no corresponding deposit of $45,000 in Mr. Adkins's investment account, id. at 1578-83.  Ultimately, on March 22, 2000, 19,999 restricted class A shares of Vianet stock were transferred to Mr. Adkins's account; the total value of plaintiffs' Vianet shares at the end of March 2000 was $129,993.50.[9]  Id. at 1592.  The record lacks any evidence that plaintiffs have disposed of their Vianet stock.

Notwithstanding the issues related to the Vianet private placement offering, the value of plaintiffs' investments with Donald & Co. rose to approximately $3.6 million in February 2000.  Id. at 1659.  At that time, plaintiffs' portfolio included a number of stocks,[10] including 66,000

---

[8]  Although the parties stated in their posttrial briefs that Mr. Adkins demanded the return of the $45,000, there is no evidence in the record describing such a demand.  See generally Tr. 122-25 (C. Adkins) (containing the testimony from Mr. Adkins regarding the Vianet stock).

[9]  On October 19, 2000, an additional 598 restricted class A shares of Vianet were transferred to Mr. Adkins's account.  JX 91 at 1602.  On December 27, 2000, all 20,597 shares were transferred from Mr. Adkins's account to Mrs. Adkins's account.  Id. at 1618, 1846.  On January 18, 2002, an additional 31,500 shares of restricted Vianet stock were transferred into Mrs. Adkins's account from an unidentified source.  Id. at 1883.

Separately, on February 7, 2001, 4592 shares of Vianet restricted common stock were transferred into Mr. Adkins's account.  Id. at 1624.  An additional 16,803 shares were transferred into Mr. Adkins's account on April 4, 2001.  Id. at 1627.  None of these 21,395 shares of stock originated from Mrs. Adkins's account.  Id. at 1856-63.

According to a registration statement that Vianet filed with the SEC, as of May 9, 2001, Mr. Adkins owned 52,889 shares of Vianet stock.  JX 66 at 1211.

[10]  Plaintiffs' portfolio did not include Classica stock in February 2000.  JX 91 at 1663-64.  Plaintiffs did not possess any Classica stock until February 2001, when 1000 shares of Classica stock (valued at $2620) were purchased for Mr. Adkins's IRA account at Donald & Co.  See JX 73 at 1354.

shares of Elec stock valued at $268,158.[11]  Id. at 1663-64.  However, plaintiffs' holdings of MyTurn stock represented most of their portfolio's value.  Id. at 1663.  Beginning in February 2000, the value of plaintiffs' MyTurn stock began to decline.  Compare id. (reflecting a value of $2,936,250 at the end of February 2000), with id. at 1669 (reflecting a value of $2,131,920 at the end of March 2000), and id. at 1677 (reflecting a value of $1,029,420 in April 2000).  As a result, the equity in plaintiffs' margin account fell below the required threshold and Donald & Co. began to issue margin calls to plaintiffs.[12]  Jt. Stip. ¶ 86.  Mr. Adkins instructed Mr. Otto Kozak to meet the margin calls by selling some of plaintiffs' stock holdings, the MyTurn stock in particular.[13]  Id. ¶ 87.  Mr. Otto Kozak did not follow this instruction; rather, he convinced Mr. Adkins to retain the MyTurn stock and meet the margin calls by transferring additional cash ($1,074,181.11) and securities (valued at $1,261,082.37) to Donald & Co.  Id. ¶¶ 87-89.

Some of the securities transferred by plaintiffs to Donald & Co. to meet the margin calls were Donald & Co. house stocks purchased by plaintiffs through other firms, including Bear, Stearns Securities Corp. ("Bear Stearns"); May Davis Group Inc. ("May Davis"); and H.J. Meyers & Co., Inc. (collectively, "third-party brokers").  Id. ¶ 82.  Specifically, through these brokers, plaintiffs purchased MyTurn stock in the amount of $143,617.72, Tera Computer Co.

---

[11]  The value of plaintiffs' Elec stock holdings peaked at $448,885 at the end of March 2000.  Compare JX 91 at 1669 (reflecting a value of $448,885 at the end of March 2000), with id. at 1676 (reflecting a value of $262,990 at the end of April 2000), and id. at 1612-13 (reflecting that plaintiffs sold all of their Elec stock for $75,543.94 in December 2000).

[12]  The SEC defines "margin call" in the following manner:

> If you buy on margin and the value of your securities declines, your brokerage firm can require you to deposit cash or securities to your account immediately, or sell any of the securities in your account to cover any shortfall, without informing you in advance.  The brokerage firm decides which of your securities to sell. Even if the brokerage firm notifies you that you have a certain number of days to cover the shortfall, it still may sell your securities before then.  A brokerage firm may at any time change the threshold at which customers are subject to a margin call.

SEC, Margin Call, https://www.investor.gov/glossary/glossary_terms/margin-call (last visited Feb. 23, 2016).

[13]  Mr. Adkins testified that he did not request that any of the MyTurn stock be sold until April 2000, and that Mr. Otto Kozak sold 10,000 shares of plaintiffs' MyTurn stock in January and February 2000 without plaintiffs' knowledge or approval.  Tr. 189-90 (C. Adkins); see also JX 91 at 1655, 1658 (reflecting the sale of the shares).  However, during a February 28, 2003 telephone interview, Mr. Adkins advised Special Agent Kurt F. Dengler of the Federal Bureau of Investigation ("FBI") that he asked Mr. Otto Kozak to sell all of the MyTurn stock in January 2000.  DX 38 (rebuttal).  The court finds that Mr. Adkins's statement to Special Agent Dengler, which was much closer in time to the events at issue, to be more reliable evidence.

stock in the amount of $26,793.13, and Great Train Store Co. stock in the amount of $40,890.00. Id. ¶ 83.  With respect to the MyTurn stock, plaintiffs purchased 13,200 shares from Bear Stearns, JX 53 at 865-66 (reflecting that 10,000 shares were purchased on May 25, 2000, and 3,200 shares were purchased on August 17, 2000), and 2,000 shares from May Davis, id. at 868-69 (reflecting the purchase of 2000 shares, in four 500-share blocks, on September 13, 2000). One of the May Davis transaction confirmation slips bore the notation that May Davis was a market maker for MyTurn stock, id. at 868, and all of the May Davis transaction confirmation slips indicated that plaintiffs' request to purchase the MyTurn stock was not solicited by May Davis, id. at 868-69.  All of plaintiffs' purchases of MyTurn stock through Bear Stearns and May Davis were made at Mr. Otto Kozak's urging.  Tr. 113-16 (C. Adkins).

By the beginning of 2002, the value of plaintiffs' investments with Donald & Co. had dropped dramatically.  Compare JX 91 at 1659 (reflecting a value of $3,589,300.84 at the end of February 2000), with id. at 1783 (reflecting a value of $9848.62 at the end of December 2001). Mr. Adkins conducted some research and realized that plaintiffs were being defrauded.  Tr. 28 (C. Adkins).  At the same time, Donald & Co. and its principals—David Stetson, Slava Volman, Steven Ingrassia, and Marc Freeman—were profiting from the pump-and-dump scheme.  See PX 10 (containing plaintiffs' April 2011 representation that "prior to the collapse in price [of the MyTurn stock, the Donald & Co.] brokers dumped their own shares at a significant profit"); DX 38 (rebuttal) (containing Mr. Adkins's February 2003 representation that Donald & Co. and Messrs. Stetson, Volman, Ingrassia, and Freeman "all owned shares in [MyTurn] and were able to sell out their positions during the time they refused to sell out [plaintiffs' MyTurn] position"). Consequently, on February 7, 2002, plaintiffs submitted a statement of claim to the NASD in support of their demand for arbitration against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia.[14]  Jt. Stip. ¶ 90; JX 42.  In their claim, plaintiffs generally alleged that the respondents

---

[14]  Plaintiffs were no strangers to the NASD arbitration process.  On February 22, 1999, they submitted a statement of claim to the NASD in support of their demand for arbitration against Philip E. Teseo and Victor M. Wang, who were brokers for Duke & Company, Inc.  DX 15 (rebuttal); DX 17 (rebuttal).  Plaintiffs alleged that Mr. Teseo and Mr. Wang defrauded them of their investments through a pump-and-dump scheme.  DX 15 (rebuttal); Tr. 155, 535, 538 (C. Adkins).  The NASD arbitration panel conducted a hearing, and on February 9, 2000, awarded plaintiffs $572,000 plus interest.  DX 15 (rebuttal).  On January 21, 2001, Mr. Wang was charged in federal court with conspiracy to commit securities fraud.  DX 19 (rebuttal).  He pled guilty that same date, and was sentenced on December 13, 2002.  Id.  As part of his sentence, he was directed to pay restitution in the amount of $11,129,582, most of which was to be paid to the SEC on behalf of the victims of the fraud.  Id.  In the meantime, on January 23, 2001, plaintiffs filed an application to confirm their arbitration award in the United States District Court for the District of Columbia.  DX 14 (rebuttal).  The district court, in a July 17, 2001 ruling, confirmed and entered judgment on the arbitration award.  DX 18 (rebuttal) (Adkins v. Teseo, 180 F. Supp. 2d 15 (D.D.C. 2001)).  As of the date of trial, plaintiffs had not collected on the judgment.  Tr. 158, 500 (C. Adkins).  Plaintiffs' inability to collect on the judgment led Mr. Adkins to believe that obtaining an arbitration award did not guarantee that compensation would be forthcoming from the arbitration.  Id. at 500.

manipulated the value of the MyTurn stock, causing them to incur substantial losses; they made no allegations concerning the Vianet stock transactions. JX 42.  Conspicuously absent from plaintiffs' demand for arbitration were three individuals:  Messrs. Freeman, Robert Kozak, and Otto Kozak, id., the three individuals that Mr. Adkins "dealt with" at Donald & Co., DX 38 (rebuttal).  Plaintiffs did not name Mr. Freeman as a respondent despite Mr. Freeman being a principal of Donald & Co., DX 38 (rebuttal); JX 15, and despite Mr. Freeman being identified as the account representative on statements for three of their investment accounts for the September 2001 to September 2002 time period, see JX 91 at 1634-40, 1774-98, 1874-84.  See also DX 38 (rebuttal) (containing Mr. Adkins's February 2003 representation that Mr. Freeman "owned shares in [MyTurn] and [was] able to sell out [his] position[] during the time [he] refused to sell out [plaintiffs' MyTurn] position").  In addition, plaintiffs did not name Mr. Robert Kozak as a respondent despite Mr. Robert Kozak refusing Mr. Adkins's directive to sell shares of MyTurn stock.[15]  Id.  And, Mr. Otto Kozak was not named as a respondent despite Mr. Otto Kozak being plaintiffs' "main broker" and despite Mr. Otto Kozak refusing Mr. Adkins's directive to sell shares of MyTurn stock.  Id.  Rather, according to Mr. Adkins, Mr. Otto Kozak was assisting plaintiffs by providing their arbitration attorneys with information regarding Donald & Co.  See, e.g., Tr. 57, 327-29, 381-82, 435-36 (C. Adkins); accord id. at 372, 392.  In fact, Mr. Otto Kozak advised Mr. Adkins and plaintiffs' arbitration attorneys before the arbitration claim was filed that he and Mr. Robert Kozak "didn't have any money . . . ."  Id. at 328-29; accord JX 2 (indicating that Messrs. Otto Kozak and Robert Kozak were represented in their criminal proceedings, initiated in May 2004, by attorneys appointed by the court pursuant to the Criminal Justice Act of 1964, which provides for the appointment of counsel "for any person financially unable to obtain adequate representation," 18 U.S.C. § 3006A(a) (2000)).

Donald & Co. ceased operations on July 24, 2002, due to insufficient capital, Jt. Stip. ¶ 62; JX 1, and Donald & Co. was expelled from the NASD on March 18, 2003, Jt. Stip. ¶ 69.

On March 24, 2003, one of plaintiffs' arbitration attorneys sent a letter to the NASD requesting that the NASD adjourn the arbitration hearing scheduled for April 1, 2003, on two grounds:

The broker-dealer Respondent, Donald & Co. Securities, Inc. has not responded fully to our demands for discovery and is no longer in business.[16]  We

---

[15]  Although Mr. Adkins told Special Agent Dengler in February 2003 that Mr. Robert Kozak declined to execute his sell order, DX 38 (rebuttal), Mr. Adkins testified that he did not "recall placing any orders with Robert Kozak," Tr. 430 (C. Adkins), characterizing Mr. Robert Kozak as Mr. Otto Kozak's assistant who sometimes relayed messages to Mr. Otto Kozak, id. at 329, 430, and as someone who "wasn't really a broker," id. at 329.  Contrary to Mr. Adkins's testimony, the documentary evidence in the record indicates that Mr. Robert Kozak was a broker—he was a registered representative at Donald & Co. from February 1999 to September or December 2001.  JX 1; JX 93.

[16]  Although one of plaintiffs' arbitration attorneys advised the NASD that Donald & Co. did not "respond[] fully" to their discovery demands, JX 43, Mr. Adkins testified that "[t]he

have been unsuccessful in our attempts to obtain necessary documents elsewhere. Thus, we would need additional time for discovery in any event.

There is a more important reason for an adjournment. One of the Claimants, Charles Adkins, has been recently contacted by the Department of Justice, which is investigating Donald & Co. and certain persons associated with it. (We have no information that any individual Respondent is the subject of the Government's investigation.) Mr. Adkins has cooperated with the Government. I have also spoken with Cynthia Monaco, the United States Attorney handling the matter, who has advised me that an indictment will be handed down in the case. We understand the indictment will be handed down in the near future. At that time, Ms. Monaco will ask that all civil litigation involving Donald & Co., including arbitrations, be stayed pending disposition of the criminal case.[17]

JX 43 (footnotes added); see also DX 38 (rebuttal) (reflecting that Special Agent Dengler interviewed Mr. Adkins by telephone on February 28, 2003, regarding the Donald & Co. stock manipulation scheme). Further, according to Mr. Adkins, the arbitration attorneys advised plaintiffs that they would be unable to proceed with arbitration without discovery and in light of the pending indictment; however, they suggested that the arbitration claim be left open in the event that proceedings in the criminal matter revealed pertinent information. Jt. Stip. ¶¶ 55, 91; accord id. ¶ 76 (indicating that plaintiffs' arbitration attorneys advised plaintiffs that "the

---

[respondents] . . . didn't reply at all to our discovery requests," Tr. 28 (C. Adkins). Thus, the precise nature of Donald & Co.'s response to the discovery demands is unclear.

[17] Paragraph 80 of the Joint Stipulation of Facts provides: "The prosecutor told Plaintiffs['] Arbitration attorney that the criminal indictments would stay the arbitration proceedings in March, 2003." Although the parties jointly stipulated to this fact, the court accords it little weight. The letter from plaintiffs' arbitration attorney indicates that the United States Attorney intended to request that all civil litigation be stayed pending the resolution of the criminal proceedings, not that she advised that all civil litigation would automatically be stayed pending resolution of the criminal proceedings. In addition, at least one arbitration claim against Donald & Co. and one of its brokers remained active during the criminal proceedings. See JX 49 (Auderer v. Donald & Co., filed on January 21, 2003, decision for claimants on March 16, 2005).

Relatedly, paragraph 70 of the Joint Stipulation of Facts provides: "The arbitration hearing before the NASD was suspended when the criminal defendant employees of Donald & Company (including Otto Kozak, David Stetson, Slava Volman, and Steven Ingrassia) were indicted . . . ." Although the parties jointly stipulated to this fact, the court accords it little weight because it is vague. It is unclear whether the word "when" refers to causation or timing. And, because the stipulated fact is written in passive voice, it is unclear who or what suspended the arbitration hearing. Moreover, as demonstrated below, the stipulated fact is inaccurate in that it provides that Mr. Stetson was indicted.

arbitration was trumped" by the indictments).  Mr. Adkins did not object to this suggestion; he testified:

> I only made two payments to my attorneys at the beginning of the case in 2002 . . . .  [T]hey were unsuccessful in getting any documents, and I told them I wasn't going to pay them any more and there's no real need to pursue it.  The attorneys were on a contingency basis, so I had paid my money on the front end, and so . . . it was really their decision.
>
> I left it up to them about continuing and not just dropping the arbitration proceeding, because they had invested in the case and . . . they hoped, I guess, maybe to get something . . . out of the case at some point in time . . . .  So, I did not object when they just kept postponing the case.
>
> And, in fact, . . . by 2003, there was no real work on the case, other than them responding to the NASDAQ [sic] board about . . . postponing the case.  I guess in 2003, I think there was a plea to get the arbitrators to compel production, but then that was the last real effort of any kind by any of us.
>
> . . . .  I know I paid $2,500 to start the case and another $5,000 in—around the end of 2002, and nothing more because it wasn't going to be productive.

Tr. 70-71 (C. Adkins); accord id. at 231-32; see also id. at 71-72 (containing Mr. Adkins's testimony that by the end of 2003, he did not think that plaintiffs would get any money from their arbitration claim), 226-29 (indicating that between 2004 and 2008, plaintiffs' arbitration attorneys requested, upon regular inquiries from the NASD, the continued postponement of the arbitration proceedings).  Thus, plaintiffs did not withdraw their arbitration claim at that time. See JX 44 (indicating that the arbitration claim was not withdrawn until April 29, 2008). Notably, three other arbitration proceedings instituted against Donald & Co. and its brokers during this time period were resolved—in the claimants' favor—in 2003.[18]  See JX 46 (Oleszek v. Donald & Co., filed on November 5, 2001, decision for claimants on February 28, 2003); JX 47 (Dobin v. Donald & Co., filed on December 18, 2001, decision for claimants on April 14, 2003); JX 48 (Sandburg v. Donald & Co., filed on May 14, 2002, decision for claimants on March 28, 2003).

Ultimately, in May 2004, a federal grand jury in the Eastern District of New York returned an indictment against several principals and employees of Donald & Co.—Mr. Ingrassia, Mr. Volman, Nicholas Antonelli, Jeffrey Bassin, Carl Cunzio, John Flanagan, Mr. Otto Kozak, Mr. Robert Kozak, and Patrick McFadden—for conspiracy to commit securities fraud, securities fraud related to the Elec and Classica stocks, and money laundering conspiracy.  JX 1;

---

[18]  A fourth such arbitration claim was resolved—in the claimants' favor—in 2005.  See JX 49 (Auderer v. Donald & Co., filed on January 21, 2003, decision for claimants on March 16, 2005).

JX 2.  Messrs. Ingrassia and Volman were also indicted for money laundering.  JX 1; JX 2.  The indictment additionally contained two criminal forfeiture allegations.  JX 1.  The first, which pertained to the securities fraud charges, indicated that the government intended, upon the criminal defendants' convictions, to seek the forfeiture "of any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses" pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).  Id.  The second, which pertained to the money laundering charges, indicated that the government intended, upon the criminal defendants' convictions, to seek the forfeiture of all property involved in the offenses, as well as all property traceable to that property, pursuant to 18 U.S.C. § 982, or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).  Id.  Specifically identified as subject to forfeiture were real property located in Bayshore, New York, and a Carver motorboat, both owned by Mr. Ingrassia.  Id.

Mr. Adkins read the indictment in 2004.  Tr. 378 (C. Adkins).  He interpreted its contents to mean that the government intended to seize any documentation concerning the identity and ownership of the criminal defendants' assets, foreclosing plaintiffs' ability to prove the existence of a theft loss and locate assets that could be used to reimburse plaintiffs for their theft loss.  Id. at 29-30, 72.  Mr. Adkins further interpreted the indictment to mean that the government was going to seize all of the criminal defendants' assets, preventing plaintiffs from attaching those assets to recover their theft loss.[19]  Id. at 29-30, 72, 223-24; see also id. at 72 (describing the indictment as "the last nail in the coffin" with respect to obtaining any recovery on plaintiffs' arbitration claim).  But see JX 62 (containing a January 2010 FBI press release possessed by plaintiffs regarding a series of pump-and-dump schemes that provides:  "In many cases, the losses were significant.  And while running an undercover operation and gathering enough evidence to put the criminals behind bars, our focus has been on helping victims get some of their hard-earned money back. . . .  So far, more than 100 seizures and forfeitures totaling over $70 million in cash, artwork, jewelry, homes, cars, and other valuables have been made, and criminals have been ordered to pay more than $130 million in restitution.  We expect millions more to be forfeited and repaid to the victims.").  Indeed, relying solely on the contents of the indictment, Mr. Adkins concluded that the government had rendered the criminal defendants judgment proof.  DX 34 (rebuttal).

Moreover, when Mr. Adkins saw the indictment and learned that only the Elec and Classica stocks—and not the MyTurn stock—were named in the document, he was upset and

---

[19]  As described below, certain defendants did agree to the entry of forfeiture money judgments against them.  See also Jt. Stip. ¶¶ 50 ("The United States seized and/or received assets . . . in connection with forfeiture money judgments . . . entered against [Messrs. Ingrassia, Volman, and Stetson]."), 51 (reflecting that the government received payments of $300,000 and $75,000 toward the forfeiture money judgments, and that "[t]he seized Carver Motorboat was not forfeited in satisfaction of any forfeiture money judgment").  Mr. Adkins testified that when he used the term "seizure," he was referring to "a forced forfeiture of their assets . . . ."  Tr. 517 (C. Adkins).

called Special Agent Dengler to express his dissatisfaction. Tr. 61-63, 289, 292, 304-05 (C. Adkins). According to Mr. Adkins, Special Agent Dengler advised him that the FBI and the prosecutors were focused on the money laundering aspects of the case, and not the securities fraud. Id. at 293, 296-97, 304-05; accord id. at 292-93, 509 (containing Mr. Adkins's testimony that Special Agent Dengler stated that the priority of the FBI and the prosecutors was to put people in jail, not to recover money for the securities fraud victims[20]); cf. id. at 62-64 (indicating Mr. Adkins's belief, based on the contents of the indictment and his discussions with Special Agent Dengler, that plaintiffs would never get their money back because (1) the government's focus was on the money laundering, (2) the government was going to take all of the criminal defendants' money through seizures and fines, and (3) the government was going to take all of the criminal defendants' documents that could support plaintiffs' arbitration claim).

Mr. Stetson, another Donald & Co. principal, was charged by information on September 21, 2004. JX 3. He was charged with conspiracy to commit securities fraud, securities fraud related to the Classica stock, and money laundering conspiracy. Id.; JX 15. The information also contained two criminal forfeiture allegations. JX 15. The first, which pertained to the securities fraud charges, indicated that the government intended, upon Mr. Stetson's conviction, to seek the forfeiture "of any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense(s)" pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (including, but not limited to, $300,000 in United States currency), or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). Id. The second, which pertained to the money laundering charge, indicated that the government intended, upon Mr. Stetson's conviction, to seek the forfeiture of all property involved in the offenses, as well as all property traceable to that property, pursuant to 18 U.S.C. § 982 (including, but not limited to, $150,000 in United States currency), or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). Id. Mr. Adkins was made aware of the criminal case against Mr. Stetson by his arbitration attorneys and Mr. Otto Kozak, but did not see the charging document until after 2004. Tr. 380-82 (C. Adkins).

In September 2004, Messrs. Ingrassia and Stetson agreed to plead guilty to the securities fraud conspiracy, securities fraud, and money laundering conspiracy charges. Jt. Stip. ¶ 79; JX 2; JX 3. Mr. Volman agreed to plead guilty to the same charges the following month. Jt. Stip. ¶ 79; JX 2. In agreeing to plead guilty, Messrs. Ingrassia and Volman would receive terms of imprisonment and supervised release, and would be subject to fines that could exceed $1.75 million, mandatory restitution in an amount to be determined, and forfeiture. JX 13; JX 14. Although Mr. Stetson's plea agreement is not included in the record or available via PACER,[21] it

[20] Mr. Adkins also testified that neither Special Agent Dengler nor anyone from the government advised him, "in so many words," that "the purpose of federal investigations is to put the guys in jail, not to recover your money[.]" Tr. 294 (C. Adkins). This testimony conflicts with his earlier trial testimony, see id. at 292-93, and his deposition testimony, see id. at 294-95. The court therefore discounts it.

[21] PACER is an acronym for Public Access to Court Electronic Records, which "is an electronic public access service that allows users to obtain case and docket information online

-11-

appears, based on the judgment entered against Mr. Stetson, that the plea agreement mirrored
those of Messrs. Ingrassia and Volman.  See JX 19.  With respect to forfeiture, the three criminal
defendants agreed, pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982, and/or 21 U.S.C.
§ 853(p), to the entry of forfeiture money judgments against them in which Mr. Ingrassia would
forfeit $100,000 to the United States,[22] Mr. Stetson would forfeit $150,000 to the United States,
and Mr. Volman would forfeit $300,000 to the United States.  JX 13; JX 14; JX 23.  The three
criminal defendants' plea agreements remained under seal until August 26, 2005.  JX 7; JX 9;
see also JX 11 (reflecting that the transcript of Mr. Volman's October 20, 2004 plea hearing was
sealed); JX 12 (reflecting that the transcript of Mr. Ingrassia's September 13, 2004 plea hearing
was sealed).  Nevertheless, Mr. Adkins learned in 2004 from his arbitration attorneys and Mr.
Otto Kozak that all of the criminal defendants intended to plead guilty.  Tr. 371-72, 380-82 (C.
Adkins).

        In addition to facing criminal penalties for their roles in the securities fraud, Messrs.
Antonelli and Stetson were barred by the SEC from acting as brokers or dealers in securities on
May 14, 2004, Jt. Stip. ¶ 78 (Stetson); Antonelli, Exchange Act Release No. 49702, 2004 WL
1086008 (May 14, 2004),[23] and Messrs. Ingrassia and Volman were barred by the SEC from
acting as brokers or dealers in securities on December 7, 2004, Jt. Stip. ¶ 77.[24]  Mr. Adkins
learned of the Stetson, Ingrassia, and Volman SEC orders from his arbitration attorneys, likely in
2004.  Tr. 75, 326-27, 329-30 (C. Adkins).  He believed that one of the consequences of these
orders was to reduce the three individuals' earning power, making the collection of any judgment
against them more difficult.  Id. at 408.

        By the end of 2004, Messrs. Ingrassia, Volman, and Otto Kozak had not paid plaintiffs
for their losses.  Jt. Stip. ¶ 47.  Nor had the United States District Court for the Eastern District of
New York entered a restitution order.  Id.

        In August 2005, Mr. Freeman was charged by information with conspiracy to commit
securities fraud, securities fraud, and money laundering conspiracy.  JX 4.  That same month,

_____

from federal appellate, district, and bankruptcy courts, and the PACER Case Locator."  See
Admin. Office of the U.S. Courts, Public Access to Court Electronic Records,
https://www.pacer.gov (last visited Feb. 19, 2016).

        [22]  Although Mr. Ingrassia's plea agreement reflected that he had agreed that a forfeiture
money judgment would be entered against him by March 1, 2005, a review of the criminal
docket indicates that such a judgment was not entered against him.  See JX 2.

        [23]  The court takes judicial notice of the Antonelli SEC order pursuant to Rule 201(b)(2)
of the Federal Rules of Evidence.

        [24]  The SEC did not take action against the other criminal defendants until May 2006.
That month, it barred Messrs. Otto Kozak, Bassin, Cunzio, and McFadden from acting as brokers
or dealers in securities, JX 92; DX 1; DX 2; DX 3, and instituted proceedings against Messrs.
Robert Kozak and Flanagan, JX 93.

Mr. Freeman agreed to plead guilty to all three charges. Id. As part of his plea agreement, he agreed to forfeit $50,000 to the United States. JX 20. He satisfied the forfeiture money judgment prior to his June 2009 sentencing. JX 4. And, as part of his sentence, Mr. Freeman was directed to pay restitution in the amount of $4,243,858. Id.

Criminal proceedings against the other Donald & Co. principals and brokers were ongoing. For example, in August 2005, Mr. Otto Kozak agreed to plead guilty to the securities fraud conspiracy and securities fraud charges filed against him. Jt. Stip. ¶ 72; JX 2; JX 54. Pursuant to his plea agreement, he was subject to imprisonment, supervised release, fines that could exceed $1.25 million, and mandatory restitution in an amount to be determined. JX 54. Mr. Otto Kozak was sentenced in July 2006. JX 2. As part of his sentence, he was directed to pay restitution in the amount of $631,482.26. Id. Before he died in April 2011, Jt. Stip. ¶ 56, Mr. Otto Kozak made restitution payments totaling $255, JX 61. Mr. Robert Kozak also agreed to plead guilty in August 2005 to the securities fraud conspiracy and securities fraud charges filed against him. JX 2. He was sentenced in August 2006, and as part of his sentence, he was directed to pay restitution in the amount of $231,641.80. Id. Another criminal defendant, Mr. Volman, satisfied the $300,000 forfeiture money judgment entered against him in September 2005, and was sentenced in July 2012. Id. As part of his sentence, Mr. Volman was directed to pay restitution in the amount of $3,590,466.50. Id.; JX 18. Mr. Ingrassia was sentenced in December 2009, and was directed to pay restitution in the amount of $4,243,858.44. JX 2; JX 18. And, Mr. Stetson, sentenced in March 2011, was directed to pay restitution in the amount of $3,590,466.50. JX 3. That same year, Mr. Stetson made a $75,000 payment in partial satisfaction of the $150,000 forfeiture money judgment entered against him. Id. The restitution obligations of Messrs. Volman, Ingrassia, Stetson, and Freeman were joint and several. JX 17; JX 18; JX 19; JX 20. As of January 28, 2014, they had paid a total of at least $7093.27 towards their obligations.[25] JX 61. Other criminal defendants—Messrs. Bassin, McFadden, Antonelli, Cunzio, and Robert Kozak—had paid a total of $44,574.63 in restitution (out of a total combined obligation of $392,223.24).[26] Id.; JX 2.

The United States Attorney's Office, having identified plaintiffs as victims of the securities fraud perpetuated at Donald & Co., Jt. Stip. ¶¶ 57, 93, kept plaintiffs apprised of the ongoing criminal proceedings, id. ¶ 73. In an August 12, 2005 letter, the office's Victim Witness Coordinator advised plaintiffs of the charges filed against the Donald & Co. brokers, that they had "[t]he right to full and timely restitution as provided in law," and that they could follow the criminal proceedings through the Victim Notification System. JX 41 at 657-58; accord Jt. Stip. ¶ 94. Later, in a March 31, 2006 letter regarding sentencing proceedings, the United States Attorney's Office advised plaintiffs that they might be contacted by a probation officer to discuss how they were affected by the securities fraud, and requested that plaintiffs complete and return an enclosed "Affidavit of Loss" to the probation officer. JX 41 at 662-64; see also id. at 663

---

[25] The record lacks any evidence regarding restitution payments made by Mr. Freeman.

[26] The record lacks any evidence regarding restitution payments made by the remaining defendant, Mr. Flanagan. Mr. Flanagan was directed to pay $330,215.48 in restitution. JX 2.

(indicating that if plaintiffs had any questions regarding the attached affidavit, they could call the probation officer at the specified telephone number).  Plaintiffs received the March 31, 2006 letter, as reflected by the fact that they later submitted it—without the associated affidavit—to the Internal Revenue Service ("IRS").  JX 55; Tr. 109-10 (C. Adkins).  However, plaintiffs did not submit the affidavit to the probation officer; indeed, Mr. Adkins does not recall receiving the affidavit.  Tr. 215-16, 501-02 (C. Adkins).  Mr. Adkins does recall speaking with Special Agent Dengler regarding whether the government needed information from plaintiffs regarding their losses on the Elec and Classica stocks; according to Mr. Adkins, Special Agent Dengler responded that the government had a sufficient number of other victims and that it did not need plaintiffs' information.[27]  Id. at 287-88, 298-99, 301, 304, 510-11.  For that reason, and because (1) the indictment did not mention the MyTurn stock and (2) Mr. Adkins did not want what he thought would be the accompanying public exposure, plaintiffs decided against officially being identified as victims.  Id. at 288-90, 292, 305-06.  It appears that because there was no affidavit submitted on plaintiffs' behalf, plaintiffs were not included on the victim lists submitted to the federal district court for the purposes of receiving restitution from the convicted Donald & Co. brokers.  See, e.g., JX 17 at 297-361 (containing the victim lists attached to Mr. Ingrassia's December 2009 criminal judgment that included customers of Messrs. Ingrassia, Freeman, Antonelli, Flanagan, Volman, Stetson, Robert Kozak, McFadden, and Cunzio, none of which included plaintiffs).  Those lists reflect that the identified victims claimed losses related to three stocks:  Classica, Elec, and "USHS."  Id.

While the criminal proceedings were pending, plaintiffs attempted to recoup some of their losses by claiming a federal income tax deduction.  JX 36; JX 37; JX 38; JX 39.  Pursuant to section 165 of the Internal Revenue Code ("IRC") and its implementing regulations, taxpayers are permitted to deduct a theft loss from their income in the year that they sustained the loss.  IRC § 165(a), (e) (2000); Treas. Reg. §§ 1.165-1(a), (d), 1.165-8(a) (2001).  Plaintiffs chose to claim the theft loss in 2004, and then carry back portions of the loss to the previous three years.  JX 36; JX 37; JX 38; JX 39.  At the time they made this decision, they had already filed their original federal income tax returns for 2001 to 2004.  JX 25 (reflecting that the original 2001 return was filed on October 21, 2002); JX 26 (reflecting that the original 2002 return was filed on October 18, 2003); JX 27 (reflecting that the original 2003 return was filed on October 19, 2004); JX 28 (reflecting that the original 2004 return was filed on October 19, 2005).  Thus, in 2006,[28] plaintiffs timely filed amended federal income tax returns reflecting a total theft loss of $2,118,725.  Jt. Stip. ¶¶ 63-66; JX 36; JX 37; JX 38; JX 39.  Plaintiffs sought income tax refunds of $115,736 for 2004, $24,021 for 2003, $71,621 for 2002, and $177,707 for 2001.  JX 36; JX

---

[27]  Mr. Adkins testified that he discussed this topic with Special Agent Dengler both before and after the indictments were issued.  Tr. 299, 301 (C. Adkins).

[28]  The amended tax returns were signed by plaintiffs in March 2006 (the amended 2004 tax return) and May 2006 (the amended 2001, 2002, and 2003 tax returns).  JX 36; JX 37; JX 38; JX 39.  However, the official records maintained by the IRS reflect that the amended tax returns were filed in May 2006 (2004) and July 2006 (2001, 2002, and 2003).  JX 25; JX 26; JX 27; JX 28.

37; JX 38; JX 39.  Plaintiffs' amended tax returns were prepared by Alan A. Gavel of JK Harris 165 Services, LLC.[29]  JX 36; JX 37; JX 38; JX 39.

On April 29, 2008, approximately two years after they filed their amended federal income tax returns, plaintiffs withdrew their arbitration claim against Donald & Co. and its brokers.  Jt. Stip. ¶ 92.  The record contains no evidence that the United States Attorney requested that plaintiffs' arbitration proceeding be stayed pending resolution of the criminal proceedings against the Donald & Co. brokers.  See also Tr. 230 (C. Adkins) (reflecting Mr. Adkins's testimony that he did not know whether the United States Attorney stayed all civil proceedings against the criminal defendants).  Indeed, at least one arbitration claim against Donald & Co. and one of its brokers resulted in an award for the claimants while the criminal proceedings were pending, notwithstanding the fact that neither Donald & Co. nor the broker ever entered an appearance in the arbitration proceedings.  See JX 49 (Auderer v. Donald & Co., filed on January 21, 2003, decision for claimants on March 16, 2005).

Subsequently, on December 12, 2008, the IRS disallowed plaintiffs' refund claims for 2001, 2003, and 2004,[30] in the total amount of $317,458.[31]  Compl. ¶ 22; Answer ¶ 22.  Plaintiffs protested the disallowance at the IRS Office of Appeals.  PX 10.  The appeal was denied because plaintiffs "failed to provide sufficient facts, evidence, substantiation and legal arguments to support the claim."  Id.  Plaintiffs retained a new attorney, who was able to reinstate the appeal.  Id.; Jt. Stip. ¶ 58.  In their resubmitted appeal, plaintiffs claimed a total theft loss, as calculated by their accountant Charles A. Bish, of $2,575,958.19.[32]  Jt. Stip. ¶ 60.  Most of that loss derived from the Donald & Co. pump-and-dump scheme; $2,336,895.58 of the loss was attributable to stock purchases made through Donald & Co. and $194,062.61 of the loss was attributable to stock purchases made via the third-party brokers.[33]  Id. ¶ 84; Tr. 122-23 (C. Adkins).  The

---

[29]  Plaintiffs had previously utilized the services of this company to prepare amended tax returns to claim a theft loss deduction related to the losses they sustained as a result of the actions of Mr. Teseo and Mr. Wang.  Tr. 535, 537, 539-40 (C. Adkins); see supra note 14.  The IRS did not contest the theft loss deduction claimed on those amended returns.  Tr. 537 (C. Adkins).

[30]  The record contains no evidence suggesting the basis for the IRS's disallowance of plaintiffs' refund claims.  Thus, it is unknown whether the IRS disallowed the refund claims because (1) it did not believe that plaintiffs' losses from the pump-and-dump scheme qualified as theft losses; (2) it concluded that 2004 was not the proper year to claim the theft loss deduction; (3) it concluded that another, specified year was the correct year to claim the theft loss deduction; or (4) of some other reason.

[31]  Plaintiffs' refund claims for those three years actually totaled $317,464.  The origin of the $6 discrepancy in the amounts is unclear.

[32]  During trial, Mr. Bish revised the amount of the theft loss to $2,540,450.63.  See Tr. 626-29 (Bish); accord PX 21.

[33]  The court derives the $194,062.61 figure by subtracting from plaintiffs' total claimed theft loss the $2,336,895.58 attributable to the Donald & Co. pump-and-dump scheme, Jt. Stip.

remaining $45,000 of the claimed loss related to plaintiffs' investment in the Vianet private placement offering.  Jt. Stip. ¶ 84; Tr. 122-23 (C. Adkins).

In an April 5, 2011 "Appeals Case Memorandum," an IRS Appeals Officer, David Kaplon, concluded, pending the final computations of the Tax Computation Specialist, that plaintiffs had sustained a theft loss of $2,532,996.01—plaintiffs' claimed theft loss minus the portion of the loss attributable to the Great Train Store Co. and Tera Computer Co. stock purchases through third-party brokers—in 2004, and were therefore entitled to the corresponding refunds.  Jt. Stip. ¶¶ 58-59; PX 10.  Mr. Kaplon described his conclusion as a "proposed settlement . . . ."  PX 10.  However, the proposed settlement was never finalized.  Tr. 465 (Kaplon).  As reflected in Mr. Kaplon's memorandum and attached transmittal form, the IRS Office of Appeals lacked jurisdiction to settle plaintiffs' claim because plaintiffs had filed suit in the United States Court of Federal Claims.  PX 10.  Indeed, plaintiffs filed suit in this court on December 10, 2010, seeking a federal income tax refund in the total amount of $317,458.

Currently, there are no funds available from the convicted Donald & Co. brokers to pay restitution to plaintiffs.  Jt. Stip. ¶ 48.  In fact, none of the named victims of the Donald & Co. pump-and-dump scheme has been fully reimbursed for their losses.  Id. ¶ 49.  Further, there is no evidence that the convicted Donald & Co. brokers—aside from Mr. Freeman—possess assets sufficient to pay restitution or any judgment against them.[34]  Id. ¶ 68.  And, plaintiffs do not have "insurance or other vehicle for recovery for [their] loss."  Id. ¶ 74.

## II.  PROCEDURAL HISTORY

As previously noted, plaintiffs filed their complaint on December 10, 2010, seeking a federal income tax refund in the total amount of $317,458.  After the close of discovery, the parties each moved for summary judgment.  Initially, the issues presented by the parties in those motions included whether plaintiffs' investment losses constituted a theft loss pursuant to IRC § 165; if so, whether 2004 was the correct year to allow the theft loss deduction; and, if plaintiffs sustained a theft loss in 2004, what was the proper amount of the deduction and associated refunds.  During supplemental briefing, defendant conceded that most of plaintiffs' investment losses—those attributable to stock purchases made through Donald & Co.—constituted a theft loss.  Thus, the issues remaining for the court's resolution were (1) whether the $239,062.61 in losses attributable to stock purchases through the third-party brokers and to the Vianet private placement offering constituted theft losses under IRC § 165; (2) whether 2004 was the correct year to allow the theft loss deduction; and (3) if a refund was proper, what was the amount of that refund.

¶ 95, and the $45,000 attributable to the alleged theft related to the Vianet private placement offering, id.; Tr. 122-23 (C. Adkins).

[34] The parties' fact stipulation does not apply to Mr. Freeman, and the record contains no evidence regarding Mr. Freeman's assets.

In a December 11, 2013 Opinion and Order, the court first addressed the losses suffered by plaintiffs that were attributable to stock purchases through the third-party brokers. Adkins v. United States, 113 Fed. Cl. 797, 804-06 (2013). It held that any losses attributable to plaintiffs' purchases of Tera Computer Co. and Great Train Store Co. stock could not constitute a theft loss under IRC § 165. Id. at 805-06. However, with respect to any losses attributable to plaintiffs' purchases of MyTurn stock through the third-party brokers, the court held that genuine issues of material fact precluded the entry of summary judgment. Id. at 805. Similarly, the court declined to enter summary judgment with respect to the alleged loss attributable to the Vianet private placement offering due to the existence of genuine issues of material fact. Id. at 806. And, genuine issues of material fact prevented the court from entering summary judgment as to whether plaintiffs properly claimed their theft loss in 2004.[35] Id. at 806-09.

Trial was held in Washington, DC on the remaining issues from November 12 to 14, 2014. During trial, the court heard testimony from plaintiffs, Mr. Kaplon, Mr. Bish, and Special Agent Dengler, and received documentary evidence. After the parties submitted posttrial briefs, the court concluded, in a February 16, 2016 Opinion and Order, that plaintiffs were not entitled to a theft loss deduction for the 2004 tax year and dismissed their complaint.[36] See generally Adkins v. United States, 125 Fed. Cl. 304 (2016), vacated, 856 F.3d 914 (Fed. Cir. 2017). Plaintiffs appealed the court's decision to the Federal Circuit. Concluding that this court misconstrued the regulation concerning the timing of a theft loss deduction, the Federal Circuit vacated the February 16, 2016 Opinion and Order and remanded the case for further proceedings.[37] See Adkins, 856 F.3d at 917-20.

---

[35] Because the proper year for the theft loss deduction remained in dispute, the court was not required to address the final issue: the amount of the refund due plaintiffs. See Adkins, 113 Fed. Cl. at 809.

[36] Because the court concluded that plaintiffs had not established entitlement to a theft loss deduction in 2004, it was not required to address whether plaintiffs could recover their losses resulting from their purchase of MyTurn stock through the third-party brokers or their alleged $45,000 loss related to the Vianet private placement offering.

[37] Because the Federal Circuit vacated the court's February 16, 2016 Opinion and Order, the findings of fact and conclusions of law contained in that decision are not binding on the court as law of the case. See Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1332 (Fed. Cir. 2003) (holding that when a judgment is vacated, the "vacated judgment 'has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case,'" and therefore the tribunal whose judgment was vacated is "free to come to different factual conclusions the second time around without revisiting its decision in the earlier vacated decision" (quoting U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 598 (Fed. Cir. 1995))); accord United States v. Munsingwear, Inc., 340 U.S. 36, 40 (1950) (observing that vacating a judgment "clears the path for future relitigation of the issues between the parties").

On remand, the parties filed a joint status report indicating that "no further testimony or evidence" was required, and proposing a schedule for supplemental briefing.  The court adopted the parties' proposed schedule.  After reviewing the briefs, the court encouraged the parties to engage in settlement discussions and, on the agreement of the parties, referred the case to the court's Alternative Dispute Resolution program.  On April 4, 2018, the parties advised the court that they were unable to reach a settlement.  The court provided the parties with a final opportunity to submit briefs in support of their positions; that briefing concluded on May 30, 2018.  The court, finding oral argument unnecessary, is now prepared to rule.

## III.  DISCUSSION

### A.  Legal Standard

The court begins its analysis by determining whether 2004 was the proper year for plaintiffs to claim their theft loss deduction.  As a general matter, a theft loss is allowed as a deduction in the year in which it is sustained, IRC § 165(a), and taxpayers are considered to have sustained a theft loss in the year in which they discover it, id. § 165(e).  However, taxpayers cannot deduct a theft loss for which they have been compensated by insurance or otherwise.  Id. § 165(a).  More particularly:

> [I]f in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained . . . until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

Treas. Reg. § 1.165-1(d)(3), cited in id. § 1.165-8(a)(2); accord id. § 1.165-1(d)(2)(i).  In its decision on appeal, the Federal Circuit explained that this regulation

> merely describes two sides of the same probabilistic coin:  a "reasonable prospect for recovery" is the inverse of "reasonable certainty" that there will be no recovery.  That is, the test in Treas. Reg. § 1.165-1(d)(3) may be simplified as follows:  the proper year in which to claim a loss is the first year in which no reasonable prospect of recovery exists anymore, starting with the year of discovery.

Adkins, 856 F.3d at 917 (footnote omitted) (citing Vincentini v. Comm'r, 429 F. App'x 560, 564 (6th Cir. 2011) (unpublished decision); Jeppsen v. Comm'r, 128 F.3d 1410, 1414-17 (10th Cir. 1997); Rainbow Inn, Inc. v. Comm'r, 433 F.2d 640, 644 (3d Cir. 1970)); accord id. at 917 n.4 ("The test could be equivalently simplified as:  the proper year in which to claim a loss is the first year in which it can be ascertained with reasonable certainty that there will be no recovery, starting with the year of discovery.").  "A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor."  Ramsay Scarlett & Co. v. Comm'r, 61 T.C. 795, 811 (1974), aff'd, 521 F.2d 786 (4th Cir. 1974).  Courts may analyze

claims not actually filed or pursued by a taxpayer when determining his reasonable prospect of recovery.  See Jensen v. Comm'r, 66 T.C.M. (CCH) 543, 547 (1993) (analyzing the reasonable prospect of recovering on a lawsuit that was not filed); Lapin v. Comm'r, 60 T.C.M. (CCH) 59 (1990) ("We cannot infer from petitioner's inaction toward the [company's] principals that there was no reasonable prospect of recovery.  The absence of a pending legal action during the year of an alleged theft loss does not necessarily mean that there was no such prospect."), aff'd, 956 F.2d 1167 (9th Cir. 1992) (unpublished table decision); Whitney v. Comm'r, 13 T.C. 897, 901 (1949) ("Losses, to be deductible under the revenue laws, must be actual, realized losses, and in any case where there is a reasonable ground for reimbursement the taxpayer must seek his redress and may not secure a loss deduction until he establishes that no recovery may be had.").

"Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances."  Treas. Reg. § 1.165-1(d)(2)(i); see Adkins, 856 F.3d at 919-20 (stating that the application of Treasury Regulation § 1.165-1(d)(2)(i) requires a "holistic analysis").  "The 'reasonableness' of a taxpayer's prospect of recovery is primarily tested objectively, although a court may consider to a limited extent evidence of the taxpayer's subjective contemporaneous assessment of his own prospect of recovery."  Jeppsen, 128 F.3d at 1418; accord Boehm v. Comm'r, 326 U.S. 287, 292 (1945) (observing that a subjective factor, such as a taxpayer's "reasonable and honest belief," cannot be "the controlling or sole criterion"); Montgomery Coca-Cola Bottling Co. v. United States, 615 F.2d 1318, 1327 (Ct. Cl. 1980) ("The subjective intent testimony of the [taxpayer] can only be seriously considered to the extent it is consistent with the objective evidence."); Parmelee Transp. Co. v. United States, 351 F.2d 619, 628 (Ct. Cl. 1965) (holding that determining a taxpayer's reasonable prospect of recovering on a claim "is an objective test looking to the probabilities of the outcome" of the proceedings on the claim).

Courts have identified at least three objective factors that are relevant to determining whether taxpayers have a reasonable prospect of recovery.  One such factor is the probability of recovery on the claim.  See Parmelee Transp. Co., 351 F.2d at 628 (remarking that a court must examine the "probability of recovery" from the claim, with a "40 to 50 percent or better chance of recovery" being considered sufficient to constitute a reasonable prospect of recovery).  A second such factor is the status of the claim, in other words, whether the claim has been settled, adjudicated, or abandoned.  See Treas. Reg. § 1.165-1(d)(2)(i) ("Whether or not . . . reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim"); see also id. ("When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release."); Alioto v. Comm'r, 699 F.3d 948, 954 (6th Cir. 2012) (holding that a taxpayer's testimony regarding his "subjective understanding that he would not be paid back" did not "meet the requirement of 'objective evidence' to prove abandonment").  And, a third such factor is the availability of civil and criminal restitution.  See Vincentini v. Comm'r, 96 T.C.M. (CCH) 400, 405 (2008) (holding that it was reasonable to anticipate that a federal district court might order "defendants, if convicted, to pay restitution to their victims . . . and to forfeit property that could be used to satisfy the restitution order"), aff'd, 429 F. App'x at 560; see also 18 U.S.C. § 3663A (2000) (requiring

courts, when sentencing a defendant convicted of a "an offense against property under [title 18 of the United States Code], . . . including any offense committed by fraud or deceit," for which the defendant's victim(s) suffered a "pecuniary loss," to order the defendant to make restitution to his victim(s)).

The court's ultimate inquiry is to determine what a "reasonable [taxpayer]" would have concluded regarding his "prospect of recovering something" in the year that he claimed his theft loss deduction. Parmelee Transp. Co., 351 F.2d at 628; accord Rainbow Inn, Inc., 433 F.2d at 644 ("The test is whether there was a reasonable prospect of recovery at the time the deduction was claimed, not later."). Thus, the "determination of a reasonable prospect of recovery is a question of foresight." Jeppsen, 128 F.3d at 1416; accord Ramsay Scarlett & Co., 521 F.2d at 789 ("[T]he standard is to be applied by foresight."); Ramsay Scarlett & Co., 61 T.C. at 811 ("[W]e do not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year."). A taxpayer need not establish "that there is no possibility of an eventual recoupment" to claim the deduction. United States v. S.S. White Dental Mfg. Co. of Pa., 274 U.S. 398, 402-03 (1927); accord Ramsay Scarlett & Co., 61 T.C. at 811 ("[C]laims for recovery whose potential for success are remote or nebulous will not demand a postponement of the deduction."). However, if the "prospect of recovery was simply unknowable" in a particular year, a taxpayer is "not entitled to take the theft loss deduction" in that year. Jeppsen, 128 F.3d at 1418.

Taxpayers bear the burden of establishing their entitlement to a theft loss deduction. Boehm, 326 U.S. at 294; accord Jeppsen, 128 F.3d at 1418 (noting that the taxpayer had a "high" burden of proving "that it could have been ascertained with reasonable certainty as of [the end of the relevant tax year] that [his] loss would never be recovered"); Parmelee Transp. Co., 351 F.2d at 628 (indicating that the taxpayer failed to meet its burden of proving a reasonable prospect of recovering its loss in the year that the loss was discovered and the theft loss deduction was claimed); Premji v. Comm'r, 72 T.C.M. (CCH) 16, 21 (1996) ("Petitioners have the burden of proving that . . . a deductible loss occurred in the year claimed"), aff'd, 139 F.3d 912 (10th Cir. 1998) (unpublished table decision). However, if "a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer," the government "shall have the burden of proof with respect to such issue."[38] IRC § 7491(a)(1). Although "credible evidence" is not defined in IRC § 7491, the statute's legislative history contains the following definition, relied upon by several courts:[39] "Credible evidence is the quality of

---

[38] The burden of proof shifts to the government only if the taxpayer establishes that he has met the procedural requirements of IRC § 7491(a)(2). In their postremand briefs, plaintiffs do not address these requirements, and defendant does not contend that plaintiffs have not met the requirements.

[39] See, e.g., Thompson v. United States, 523 F. Supp. 2d 1291, 1296-97 (N.D. Ala. 2007); Okerlund v. United States, 53 Fed. Cl. 341, 356 & n.23 (2002), aff'd, 365 F.3d 1044 (Fed. Cir. 2004); Davis v. Comm'r, 89 T.C.M. (CCH) 1518, 1522 (2005). But see Heger v. United

evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." H.R. Rep. No. 105-599, at 240-41 (1998) (Conf. Rep.).

## B.  Plaintiffs Discovered the Theft Loss in 2002 and Had a Reasonable Prospect of Recovery in That Year

There is no dispute that plaintiffs discovered the theft loss in 2002.[40]  And, neither plaintiffs nor defendant disputes that in 2002, there existed "a claim for reimbursement with respect to which there [was] a reasonable prospect of recovery . . . ." Treas. Reg. § 1.165-1(d)(3).  Plaintiffs filed their arbitration claim against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia in February 2002, and by the end of that year, they had neither sought to adjourn the proceedings nor withdrawn their claim.  Accordingly, in light of the ongoing arbitration proceedings, plaintiffs could not claim a theft loss deduction in 2002.  Instead, they were required to delay their deduction until the "year in which it [could] be ascertained with reasonable certainty whether or not" they could receive reimbursement for their losses.  Id.  Plaintiffs determined that the proper year to claim their theft loss was 2004, and filed amended federal income tax returns reflecting the deduction.  The IRS disallowed plaintiffs' refund claim, and the government takes the position in this litigation that 2004 was not the proper year for plaintiffs to claim their theft loss deduction.  Thus, the court's task is to determine whether plaintiffs had, in 2004, a reasonable prospect of recovering at least some of their losses.

## C.  Plaintiffs Have Not Established That They Are Entitled to Claim a Theft Loss Deduction in 2004

### 1.  The Parties' Positions

In their postremand briefs, plaintiffs rely on the following facts in support of their contention that in 2004, they had no reasonable prospect of recovering their losses:

- In 2003, plaintiffs' arbitration attorneys requested an adjournment of the arbitration hearing against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia because (1) Donald & Co. had not provided a full response to their discovery requests and (2) they learned that the federal government was investigating Donald & Co. and unknown associated individuals, which they understood would lead to an indictment and a request that all civil proceedings be stayed.

---

States, 103 Fed. Cl. 261, 266 n.4 (2012) ("The definition was not included in the statute itself, so the court considers it to be merely informative rather than authoritative.").

[40]  Indeed, although the parties did not stipulate to this fact prior to trial, they affirmatively stated in their posttrial briefs that plaintiffs discovered the theft loss in 2002.

- In 2003, plaintiffs ceased paying their arbitration attorneys and no further legal work was done on the arbitration thereafter.

- In May 2004, Messrs. Ingrassia, Volman, Antonelli, Bassin, Cunzio, Flanagan, Otto Kozak, Robert Kozak, and McFadden were indicted for conspiracy to commit securities fraud, securities fraud, and money laundering conspiracy; Messrs. Ingrassia and Volman were also indicted for money laundering.  The indictment contained criminal forfeiture allegations and mentioned only the Elec and Classica stocks.

- Upon reading the indictment in 2004, Mr. Adkins believed that there was no chance that plaintiffs' losses could be recovered because (1) he believed that the government would seize the criminal defendants' assets; (2) he believed that the government would seize the criminal defendants' documents; (3) he had no evidence that the criminal defendants were solvent; (4) the indictment concerned the Elec and Classica stocks, and did not mention the stock that generated the majority of plaintiffs' losses—MyTurn; and (5) Special Agent Dengler indicated that the FBI's priority was to put people in jail and not to recover money for securities fraud victims.

- In May and December 2004, the SEC barred Messrs. Stetson, Ingrassia, and Volman from acting as brokers or dealers in securities.

- In September 2004, Mr. Stetson was charged with conspiracy to commit securities fraud, securities fraud, and money laundering conspiracy.  The information contained criminal forfeiture allegations.

- In September and October 2004, Messrs. Ingrassia, Stetson, and Volman agreed to plead guilty to the charges of conspiracy to commit securities fraud, securities fraud, and money laundering conspiracy.[41]

In short, plaintiffs contend that they would have been unable to recover their losses in 2004 because they understood that (1) arbitration would be fruitless due to the respondents' failure to fully respond to plaintiffs' discovery requests and (2) the criminal defendants would lack any funds for paying back the losses due to the government's intent to seize all of their assets and their inability to be gainfully employed in their chosen profession.  Plaintiffs further contend that even if the criminal defendants were solvent, plaintiffs would have had no way to ascertain the criminal defendants' financial situations in 2004 due to their (1) difficulty obtaining discovery during the arbitration proceedings and (2) belief that the government would seize all of the criminal defendants' documents.

---

[41]   In their opening postremand brief, plaintiffs incorrectly contend that Messrs. Ingrassia, Stetson, and Volman were sentenced in 2004.  These individuals were sentenced in 2009 (Ingrassia), 2011 (Stetson), and 2012 (Volman).

In contrast, defendant asserts that plaintiffs' reasonable prospect of recovering at least some of their losses in 2004 was simply unknowable. Defendant focuses initially on plaintiffs' arbitration claim. Defendant asserts that plaintiffs had a viable claim in 2004, relying in part on the fact that a separate arbitration claim against Donald & Co. and its brokers, filed in January 2003, resulted in an award for the claimants in 2005. Further, defendant argues, plaintiffs could not have known in 2004 whether—or to what extent—they could recover on their claim, for two reasons. First, defendant observes that plaintiffs did not know anything regarding the financial resources of the three individual arbitration respondents—Messrs. Stetson, Ingrassia, and Volman—as reflected by the lack of evidence in the record (1) regarding the respondents' financial conditions in 2002, 2003, or 2004; (2) that plaintiffs attempted to ascertain whether the respondents possessed any assets; (3) that plaintiffs' arbitration attorneys attempted to ascertain whether the respondents possessed any assets; (4) reflecting the results of any asset search undertaken by plaintiffs or their arbitration attorneys; (5) that an arbitration award would be actually uncollectible; and (6) that the government actually seized the respondents' documents as part of the criminal proceedings. Second, defendant notes that evidence in the record indicates that in 2004, plaintiffs were aware of assets that may have been available to reimburse them for their losses—bank accounts owned by Odyssey Capital, LLC; real and personal property owned by Mr. Ingrassia; and profits from the pump-and-dump scheme—but did not seek to attach them. Defendant argues that in the absence of any evidence that plaintiffs sought or obtained information regarding the respondents' financial resources, or attempted to attach the respondents' known assets, plaintiffs could not have known in 2004 whether they had a reasonable prospect of recovering at least some of their losses via their arbitration claim.

Defendant next addresses the avenues of recovery that plaintiffs did not pursue: claims against Messrs. Freeman, Otto Kozak, and Robert Kozak. Defendant notes that Mr. Freeman was one of Donald & Co.'s principals, that Mr. Adkins dealt with all three of these individuals in conjunction with plaintiffs' accounts at Donald & Co., and that all three individuals were involved in the pump-and-dump scheme. Consequently, defendant asserts, plaintiffs had viable claims against each of these individuals. Nevertheless, defendant remarks, the record lacks any evidence that plaintiffs attempted to independently ascertain the financial condition of the individuals, and that with respect to the Kozaks, Mr. Adkins relied solely on Mr. Otto Kozak's representation that he and Mr. Robert Kozak did not have any money. Defendant therefore argues that plaintiffs could not have known in 2004 whether they had a reasonable prospect of recovering at least some of their losses by filing claims against Messrs. Freeman, Otto Kozak, and Robert Kozak.

Finally, defendant observes that another avenue for plaintiffs to recover their losses was established in 2004 when criminal proceedings were initiated against a number of principals and employees of Donald & Co. (Messrs. Ingrassia, Volman, Antonelli, Bassin, Cunzio, Flanagan, Otto Kozak, Robert Kozak, McFadden, and Stetson), namely, restitution. Defendant asserts that although Mr. Adkins knew in 2004 that the criminal defendants might be required to forfeit assets and that the criminal defendants intended to plead guilty, the record lacks any evidence that plaintiffs could have known anything in 2004 regarding the criminal defendants' restitution obligations or the criminal defendants' abilities to satisfy any restitution obligations. Defendant

further asserts that the record does not contain any evidence that plaintiffs knew in 2004 the number of victims of the pump-and-dump scheme or the extent of the victims' losses.  Thus, defendant contends, plaintiffs' reasonable prospect of recovering their losses through restitution was simply unknowable in 2004.

### 2.  Whether There Was a Reasonable Prospect of Recovery in 2004 Was Simply Unknowable

Applying the binding precedent of the United States Supreme Court ("Supreme Court"), the Federal Circuit, and the United States Court of Claims ("Court of Claims"), as well as the precedent from other federal appellate courts specifically endorsed by the Federal Circuit and other persuasive precedent, the court concludes that based on the evidence in the record, a reasonable taxpayer in plaintiffs' position could not have known, in 2004, whether he had a reasonable prospect of recovering at least some of his losses.  Therefore, plaintiffs have not met their burden of proving that they were entitled to claim a theft loss deduction in 2004.

As defendant notes, in 2004 plaintiffs had several avenues by which they could attempt to recover their losses:  (1) the arbitration claim they filed against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia in 2002; (2) possible claims against Messrs. Freeman, Otto Kozak, and Robert Kozak; and (3) restitution in conjunction with the criminal proceedings initiated in 2004 against Messrs. Ingrassia, Volman, Antonelli, Bassin, Cunzio, Flanagan, Otto Kozak, Robert Kozak, McFadden, and Stetson.  The court addresses each avenue in turn.

### a.  Plaintiffs' Arbitration Claim

With respect to plaintiffs' arbitration claim, the relevant objective evidence in the record reflects the following:

- Plaintiffs filed for arbitration against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia in 2002.

- Messrs. Stetson, Volman, and Ingrassia were principals of Donald & Co.

- Plaintiffs' arbitration attorneys sought discovery from Donald & Co. and Messrs. Stetson, Volman, and Ingrassia, but received little, if anything, in response.

- The Department of Justice contacted Mr. Adkins prior to March 24, 2003, and advised him that it was investigating Donald & Co. and unnamed associated individuals.

- Prior to March 24, 2003, the United States Attorney handling the Donald & Co. investigation advised plaintiffs' arbitration attorneys that an indictment was forthcoming and that upon the filing of the indictment, she would request

that all civil litigation, including arbitrations, be stayed pending the disposition of the criminal proceedings.

- Plaintiffs' arbitration attorneys advised plaintiffs that they would be unable to proceed without discovery and in light of the pending indictment, but suggested that the arbitration proceedings remain open in the event that pertinent information was revealed during the criminal proceedings.

- Other individuals who filed for arbitration against Donald & Co. and its brokers in late 2001 and 2002 pursued their claims and received awards in their favor in 2003.

- In May 2004, the SEC barred Mr. Stetson from acting as a broker or dealer in securities, and in December 2004, the SEC barred Messrs. Volman and Ingrassia from acting as brokers or dealers in securities.

- In May 2004, Messrs. Volman and Ingrassia were indicted on securities fraud and money laundering charges; the indictment included criminal forfeiture allegations and mentioned only the Elec and Classica stocks.

- Criminal charges were brought against Mr. Stetson in 2004.

- Plaintiffs' arbitration attorneys advised Mr. Adkins that all of the criminal defendants intended to plead guilty.

- Donald & Co. principals funded a proprietary trading account through Odyssey Capital LLC.

- Donald & Co. accumulated profits from its fraudulent scheme in Odyssey Capital LLC accounts at, among other places, Chase Manhattan Bank.

- Messrs. Stetson, Volman, and Ingrassia realized significant profits from the pump-and-dump scheme.

- Mr. Ingrassia owned real property located in Bayshore, New York, and a Carver motorboat.

The evidence in the record reflects that Mr. Adkins was made aware of all of these facts in 2004, either by plaintiffs' arbitration attorneys, the Department of Justice, or Mr. Otto Kozak, or from reading the indictment.

Based on the representations from plaintiffs' arbitration attorneys regarding the insufficient discovery responses and the possible stay request, Mr. Adkins believed, by the end of 2003, that plaintiffs would not recover anything from the arbitration. However, there is no

evidence in the record that the arbitration respondents' failure to fully respond to plaintiffs' discovery requests foreclosed plaintiffs from proceeding with their claim and obtaining an award.  Indeed, other claimants obtained arbitration awards against Donald & Co. and its brokers during this same period of time.  In addition, there is no evidence in the record that plaintiffs sought to determine whether Donald & Co. or Messrs. Stetson, Volman, and Ingrassia had any assets that could be used to satisfy an arbitration award.  Moreover, the record lacks any evidence that the United States Attorney ever requested that plaintiffs' arbitration proceedings be stayed pending the resolution of the criminal proceedings.  Thus, Mr. Adkins's subjective belief, in 2003, that plaintiffs would not recover anything from the arbitration is not supported by any objective evidence.  A reasonable taxpayer, armed with the facts known to plaintiffs, could not have known at the end of 2003 whether a reasonable prospect of recovering on the arbitration claim existed.[42]

In 2004, Messrs. Volman and Ingrassia—and seven other individuals associated with Donald and Co. (but not Mr. Stetson)—were indicted for securities fraud and money laundering.  Upon reading the indictment, Mr. Adkins believed that the government intended to seize any documentation concerning the identity and ownership of the criminal defendants' assets, foreclosing plaintiffs' ability to prove the existence of a theft loss and locate assets that could be used to reimburse plaintiffs for their losses, and that the government was going to seize all of the criminal defendants' assets, preventing plaintiffs from attaching those assets to recover their losses.  However, the record lacks any evidence that the government ever seized any of the criminal defendants' documents or records.  The record also lacks any evidence that the government seized any of the criminal defendant's assets prior to September 2005, when Mr. Volman satisfied the $300,000 forfeiture money judgment entered against him.  Further, the record is bereft of any evidence that plaintiffs or their arbitration attorneys attempted to ascertain the financial condition of any of the criminal defendants.  What the evidence in the record does demonstrate is that Donald & Co. principals executed trades through Odyssey Capital LLC; Donald & Co. accumulated profits in bank accounts owned by Odyssey Capital LLC; Messrs. Stetson, Volman, and Ingrassia realized significant profits from the pump-and-dump scheme; and Mr. Ingrassia owned attachable assets.  In short, Mr. Adkins's subjective belief that the indictment foreclosed any opportunity for plaintiffs to recover their losses from the arbitration respondents is not supported by the objective evidence in the record.  A reasonable taxpayer, knowing in 2004 that the arbitration respondents possessed assets that might be available to satisfy an arbitration award, but who had not yet ascertained whether an arbitration award would be collectible, could not have known in 2004 whether he had a reasonable prospect of recovery.

---

[42]   In their postremand briefs, plaintiffs suggest that the court could find that 2003 was the proper year for them to claim the theft loss deduction notwithstanding their claim that the proper year was 2004.  See, e.g., Pls.' Postremand Br. 11-13 ("Thus the court has been left with only the alternative years of 2003 and 2004 . . . .  Assuming for arguments sake that 2003 is the year, the Court can still award judgment for refunds for 2001, 2002, 2003 and 2004.  . . .  [I]f the Court determined that 2003 was the year of loss, the refund must be granted in full.").  The court declines plaintiffs' invitation because, as noted above, whether plaintiffs had a reasonable prospect of recovering on their arbitration claim was simply unknowable in 2003.

This conclusion is not altered by Mr. Adkins's knowledge that Messrs. Stetson, Volman, and Ingrassia intended to enter guilty pleas or that the SEC barred Messrs. Stetson, Volman, and Ingrassia from acting as brokers or dealers in securities.  With respect to the former, knowledge of an intent to plead guilty does not equate to knowledge of the contents of the plea agreement.  Indeed, plaintiffs did not testify that they knew the contents of the plea agreements, which is consistent with the fact that the agreements remained under seal until August 2005.  With respect to the latter, the fact that Messrs. Stetson, Volman, and Ingrassia could not work in one profession does not mean that they could not be gainfully employed in another profession or that they lacked other sources of income.  Thus, plaintiffs, or any reasonable taxpayer, could not have known at the end of 2004 the impact that the plea agreements and SEC orders would have on the financial resources of Messrs. Stetson, Volman, and Ingrassia.

### b.  Possible Claims Against Messrs. Freeman, Otto Kozak, and Robert Kozak

The court next addresses the claims that plaintiffs could have made, but did not.  Although plaintiffs pursued arbitration against Donald & Co. and three of its principals, they did not pursue claims against the three individuals who they actually dealt with at Donald & Co.— Messrs. Freeman, Otto Kozak, and Robert Kozak.  Relevant to plaintiffs' decision not to file such claims are the following facts derived from the objective evidence in the record:

- Mr. Freeman was a principal of Donald & Co.

- Mr. Freeman was identified as the account representative for several of plaintiffs' accounts at Donald & Co. from September 2001 to September 2002.

- Mr. Otto Kozak was plaintiffs' main broker.

- Mr. Adkins dealt with Messrs. Freeman, Otto Kozak, and Robert Kozak.

- In February 2002, plaintiffs filed for arbitration against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia.  Plaintiffs did not name Messrs. Freeman, Otto Kozak, or Robert Kozak as respondents.

- Messrs. Freeman, Otto Kozak, and Robert Kozak were involved in the pump-and-dump scheme.

- Mr. Otto Kozak told Mr. Adkins that neither he nor Mr. Robert Kozak had any money.

- Mr. Otto Kozak assisted plaintiffs by providing their arbitration attorneys with information regarding Donald & Co.

- In May 2004, Messrs. Otto Kozak, and Robert Kozak were indicted on securities fraud and money laundering charges; the indictment included criminal forfeiture allegations and mentioned only the Elec and Classica stocks.

- During the criminal proceedings, Messrs. Otto Kozak and Robert Kozak were represented by attorneys appointed by the court pursuant to the Criminal Justice Act of 1964.

- Plaintiffs' arbitration attorneys advised Mr. Adkins that all of the criminal defendants intended to plead guilty.

- Donald & Co. principals funded a proprietary trading account through Odyssey Capital LLC.

- Donald & Co. accumulated profits from its fraudulent scheme in Odyssey Capital LLC accounts at, among other places, Chase Manhattan Bank.

- Mr. Otto Kozak realized significant profits from the pump-and-dump scheme.

The evidence in the record reflects that Mr. Adkins was aware of all of these facts in 2004, and of the first eight facts in 2002 or earlier. The evidence in the record further reflects that plaintiffs could not have been aware of the following facts in 2004 or earlier because they relate to events that occurred in 2005:

- Mr. Freeman was charged by information with securities fraud and money laundering in August 2005.

- Messrs. Freeman, Otto Kozak, and Robert Kozak executed plea agreements with the government in August 2005.

With respect to Messrs. Otto Kozak and Robert Kozak, the evidence in the record indicates that plaintiffs had claims against the Kozaks when they lodged their February 2002 arbitration claim, but chose not to pursue them. Plaintiffs apparently decided not to name Mr. Otto Kozak as a respondent due to the assistance he was providing to plaintiffs and their arbitration attorneys. Further, Mr. Adkins appears to have taken Mr. Otto Kozak at his word that he and Mr. Robert Kozak lacked any money that could be used to satisfy a judgment against them. There is no evidence in the record that plaintiffs or their arbitration attorneys attempted to independently ascertain the financial conditions of Messrs. Otto Kozak and Robert Kozak (rather than just relying on Mr. Otto Kozak's representation), either at the time that plaintiffs filed for arbitration in February 2002 or thereafter. However, a reasonable taxpayer, knowing that the brokers who he dealt with were involved in the pump-and-dump scheme, would have investigated Mr. Otto Kozak's claim of destitution before forgoing the opportunity to recover his losses from Messrs. Otto Kozak and Robert Kozak. Further, in the absence of any supporting evidence of the Kozaks' financial conditions, the reasonable prospect of recovery on such a

claim would have been simply unknowable—at least until Messrs. Otto Kozak and Robert Kozak were indicted in 2004. During the criminal proceedings, the Kozaks were represented by attorneys appointed by the court pursuant to the Criminal Justice Act of 1964. A reasonable taxpayer, armed with this knowledge, could have concluded that he had no prospect of recovering any losses from Messrs. Otto Kozak and Robert Kozak in 2004.

The same conclusion cannot be reached with respect to Mr. Freeman. Mr. Freeman was a principal of Donald & Co., served as an account representative for several of plaintiffs' accounts for at least one year, and was not charged with any crimes until August 2005. Yet there is no evidence in the record that plaintiffs considered naming Mr. Freeman as a respondent in the arbitration proceedings, such as evidence that plaintiffs or their arbitration attorneys conducted an asset search and discovered that Mr. Freeman lacked any funds to satisfy a judgment. A reasonable taxpayer in plaintiffs' position would have pursued a claim against Mr. Freeman in 2002 or thereafter, and would not have had any reason to suspect in 2004 that he would not be able to recover at least some of his losses through that claim. Thus, at a bare minimum, plaintiffs' reasonable prospect of recovery from Mr. Freeman was simply unknowable in 2004.

### c. Restitution

Finally, the court considers plaintiffs' reasonable prospect of recovering their losses through restitution—a claim that became available in 2004 upon the initiation of criminal proceedings against Messrs. Ingrassia, Volman, Antonelli, Bassin, Cunzio, Flanagan, Otto Kozak, Robert Kozak, McFadden, and Stetson. The following facts derived from the objective evidence in the record are relevant to the status of plaintiffs' restitution claim in 2004:

- Messrs. Stetson, Volman, and Ingrassia were principals of Donald & Co.

- In May 2004, the SEC barred Messrs. Antonelli and Stetson from acting as brokers or dealers in securities, and in December 2004, the SEC barred Messrs. Volman and Ingrassia from acting as brokers or dealers in securities.

- In May 2004, Messrs. Ingrassia, Volman, Antonelli, Bassin, Cunzio, Flanagan, Otto Kozak, Robert Kozak, McFadden were indicted on securities fraud and money laundering charges; the indictment included criminal forfeiture allegations and mentioned only the Elec and Classica stocks.

- After he read the indictment, Mr. Adkins called Special Agent Dengler to express his dissatisfaction regarding the omission of MyTurn stock from the indictment.

- Criminal charges were brought against Mr. Stetson in 2004.

- Plaintiffs' arbitration attorneys advised Mr. Adkins that all of the criminal defendants intended to plead guilty.

- Donald & Co. principals funded a proprietary trading account through Odyssey Capital LLC.

- Donald & Co. accumulated profits from its fraudulent scheme in Odyssey Capital LLC accounts at, among other places, Chase Manhattan Bank.

- Messrs. Volman, Ingrassia, and Otto Kozak realized significant profits from the pump-and-dump scheme.

- Mr. Otto Kozak told Mr. Adkins before February 2002 that neither he nor Mr. Robert Kozak had any money.

- During the criminal proceedings, Messrs. Otto Kozak and Robert Kozak were represented by attorneys appointed by the court pursuant to the Criminal Justice Act of 1964.

- Mr. Ingrassia owned real property located in Bayshore, New York, and a Carver motorboat.

The evidence in the record reflects that Mr. Adkins was aware of all of these facts in 2004.

Based on the contents of the indictment and his discussions with Special Agent Dengler (in which Special Agent Dengler purportedly advised him that the government's priority was to put people in jail, not to recover money for the securities fraud victims), Mr. Adkins believed that plaintiffs would never recover their losses because (1) the government's focus was on the money laundering, (2) the indictment did not mention MyTurn stock, and (3) the government was going to take all of the criminal defendants' assets through seizures and fines. However, the record does not contain any objective evidence indicating that plaintiffs could have known, in 2004, that restitution would not be a viable avenue of recovering at least some of their losses.

In 2004, plaintiffs knew that criminal charges had been brought against Messrs. Ingrassia, Volman, Antonelli, Bassin, Cunzio, Flanagan, Otto Kozak, Robert Kozak, McFadden, and Stetson, and that all of these individuals intended to enter guilty pleas. Although individuals convicted of securities fraud are required to pay restitution to their victims, and plaintiffs knew that all of the criminal defendants intended to enter guilty pleas, plaintiffs did not know, in 2004, the charges to which the criminal defendants would be pleading guilty or any details regarding the expected restitution awards (such as the amount of the awards, the number of victims entitled to restitution, or whether the liability would be joint and several among the criminal defendants). Further, aside from Messrs. Otto Kozak and Robert Kozak, plaintiffs did not know whether the criminal defendants had the wherewithal to satisfy their restitution obligations.[43] As noted

_____

[43] Ultimately, it turns out that the convicted criminal defendants do not possess the financial resources to make full restitution to their victims, but this is information that plaintiffs did not know, and never attempted to ascertain, in 2004.

above, the record lacks any evidence that plaintiffs attempted to ascertain the financial condition of any of the criminal defendants, and there is no evidence that the government seized any of the criminal defendants' assets prior to September 2005 such that the assets would be unavailable for restitution. Rather, the evidence in the record reveals that Donald & Co. principals executed trades through Odyssey Capital LLC, Donald & Co. accumulated profits in bank accounts owned by Odyssey Capital LLC, Messrs. Volman and Ingrassia realized significant profits from the pump-and-dump scheme, and Mr. Ingrassia owned attachable assets. Thus, a reasonable taxpayer, knowing in 2004 that at least some of the criminal defendants possessed assets that might be available to satisfy a restitution award, but who had not yet ascertained whether the criminal defendants had sufficient funds to make restitution, could not have known in 2004 whether he had a reasonable prospect of recovering at least some of his losses via restitution.[44]

This conclusion is not altered by Mr. Adkins's knowledge that the SEC barred Messrs. Antonelli, Stetson, Volman, and Ingrassia in 2004 from acting as brokers or dealers in securities, or by Mr. Adkins's knowledge that the indictment mentioned the Elec and Classica stocks, but not the MyTurn stock. First, as previously noted, the fact that Messrs. Antonelli, Stetson, Volman, and Ingrassia could not work in one profession does not mean that they could not be gainfully employed in another profession or that they lacked other sources of income. Second, the omission of the MyTurn stock from the indictment is immaterial because plaintiffs owned at least one of the stocks mentioned in the indictment during the relevant time period, and because the record lacks any evidence that plaintiffs were advised that they would be precluded from obtaining restitution related to their MyTurn losses even though the stock was not mentioned in the indictment.[45] Thus, plaintiffs, or any reasonable taxpayer with plaintiffs' knowledge, could not have known at the end of 2004 whether the SEC orders or the omission of MyTurn stock from the indictment would impact their ability to obtain restitution.

### d. Summary

In short, in 2003, plaintiffs, or any reasonable taxpayer with plaintiffs' knowledge, could not have known whether they would have been able to recover their losses via (1) the arbitration claim they filed against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia or (2) a possible claim against Messrs. Freeman, Otto Kozak, or Robert Kozak. Further, in 2004, plaintiffs, or any reasonable taxpayer with plaintiffs' knowledge, could not have known whether they would have been able to recover their losses via (1) the arbitration claim they filed against Donald & Co. and Messrs. Stetson, Volman, and Ingrassia; (2) a possible claim against Mr. Freeman; or (3) restitution from Messrs. Ingrassia, Volman, Antonelli, Bassin, Cunzio, Flanagan, McFadden, or Stetson. In other words, plaintiffs' reasonable prospect of recovering their losses

---

[44] Notably, although plaintiffs were officially notified in August 2005 of their right to restitution, they chose not to exercise that right, foreclosing their opportunity to recover any of their losses in this manner.

[45] Indeed, a victim list made public in 2009 indicated that victims who owned a stock not mentioned in the indictment—USHS—were allowed to seek restitution.

was simply unknowable by the end of 2004.  Therefore, in accordance with the relevant precedent, plaintiffs have not established that they were entitled to claim a theft loss deduction for the 2004 tax year.[46]

### 3.  Plaintiffs' Other Arguments Lack Merit

Plaintiffs raise two additional arguments in support of their contention that 2004 was the proper year to claim a theft loss deduction.  Neither has merit.

### a.  Revenue Procedure 2009-20

First, plaintiffs urge the court to follow the guidance set forth in Revenue Procedure 2009-20 to find that 2004 was the proper year for the theft loss deduction.  Revenue Procedure 2009-20, published by the IRS on April 6, 2009, addresses the tax treatment of losses from "Ponzi" schemes—schemes "in which the party perpetrating the fraud receives cash or property from investors, purports to earn income for the investors, and reports to the investors income amounts that are wholly or partially fictitious," and in which "[p]ayments, if any, of purported income or principal to investors are made from cash or property that other investors invested in the fraudulent arrangement."  Rev. Proc. 2009-20, 2009-14 I.R.B. 749, 749.  The procedure creates "an optional safe harbor under which qualified investors . . . may treat a loss as a theft loss deduction" in the year that one or more of the lead figures of the fraudulent arrangement "was charged by indictment or information (not withdrawn or dismissed) under state or federal law with the commission of fraud, embezzlement or a similar crime that, if proven, would meet the definition of theft for purposes of" IRC § 165.  Id. at 749-50.

Plaintiffs' attempt to analogize the fraudulent arrangement addressed in Revenue Ruling 2009-20 to the pump-and-dump scheme at issue here is unavailing.  As noted above, in a Ponzi scheme, the perpetrator reports fictitious earnings to investors and makes payments to investors from others' investments rather than from the investors' own accounts.  In the pump-and-dump scheme perpetrated by Donald & Co., plaintiffs' earnings and losses were not fictitious (in that plaintiffs actually owned the relevant stocks and the value of those stocks actually fluctuated), and the payments they received were drawn from their own accounts at Donald & Co., not the investments of others.  While Ponzi schemes and pump-and-dump schemes are both fraudulent arrangements that serve to deprive investors of funds they invested, the IRS has clearly

---

[46]  Because plaintiffs have not demonstrated that they sustained their theft loss in 2004, the court need not resolve whether plaintiffs could recover their losses resulting from their purchase of MyTurn stock through the third-party brokers or their alleged $45,000 loss related to the Vianet private placement offering.  These claimed losses were part of plaintiffs' 2004 theft loss deduction.  Moreover, even if the alleged loss related to the Vianet private placement offering should be treated separately because it was not mentioned in plaintiffs' arbitration claim, plaintiffs presented no evidence regarding whether they had a reasonable prospect of recovering on a claim for reimbursement of the alleged loss in the year that they discovered the loss or thereafter.

differentiated the two types of schemes by choosing to create a safe harbor tax treatment for Ponzi schemes and not for pump-and-dump schemes. Thus, the court declines plaintiffs' invitation to adopt a safe harbor in this case analogous to the one created in Revenue Ruling 2009-20.[47]

### b. Defendant's Failure to Produce Evidence

Second, plaintiffs argue that defendant failed to assert or prove that a year other than 2004 was the proper year for them to claim the theft loss deduction. Indeed, plaintiffs repeatedly contend in their postremand briefs that defendant failed to produce any evidence in support of an alternative year. In doing so, plaintiffs misapprehend the burden of proof applicable in this case.

As described above, the Supreme Court and the Court of Claims have held that taxpayers bear the burden of establishing their entitlement to a theft loss deduction, with the Court of Claims specifically providing that taxpayers bear the burden of proving the lack of a reasonable prospect of recovery in the year they claim the theft loss deduction. Thus, it was up to plaintiffs to establish that 2004—the year that they claimed on their amended tax returns—was the proper year to claim the theft loss deduction. Because, as the court has concluded, plaintiffs failed to produce credible evidence that they had no reasonable prospect of recovery in 2004, the burden never shifted to defendant to prove that 2004 was not the proper year for plaintiffs to claim the theft loss deduction. Defendant was permitted to rely on the insufficiency of evidence offered by plaintiffs to support its position that plaintiffs were not entitled to a theft loss deduction in 2004.

## IV. CONCLUSION

Unquestionably, plaintiffs are the victims of a theft and have not subsequently recovered their losses. What remains in dispute is whether plaintiffs claimed the theft loss deduction in the proper year, in other words, the year that they sustained the loss. Plaintiffs claim that they sustained the loss in 2004 because by the end of that year, they had no reasonable prospect of recovery. However, the evidence in the record reflects that plaintiffs had three avenues to recover their losses in 2004—an open arbitration claim against Donald & Co. and three of its principals, a possible claim against a fourth Donald & Co. principal, and criminal restitution—and that plaintiffs' reasonable prospect of recovery via these avenues was simply unknowable in that year. The evidence in the record further reflects that plaintiffs had two avenues to recover their losses in 2003—the open arbitration claim and possible claims against the individuals with whom plaintiffs dealt with at Donald & Co.—and that plaintiffs' reasonable prospect of recovery via these avenues was simply unknowable in that year.

---

[47] Moreover, to the extent that plaintiffs are requesting that the court directly (rather than by analogy) apply Revenue Procedure 2009-20 to this case, the court declines to do so because (1) the pump-and-dump scheme at issue in this case does not meet the procedure's definition of "[s]pecified fraudulent arrangement," see 2009-14 I.R.B. at 750, and (2) the procedure only "applies to losses for which the discovery year is a taxable year beginning after December 31, 2007," id. at 751.

Indeed, the record contains evidence that other individuals were able to obtain awards against Donald & Co. and associated individuals via arbitration, both in 2003 before the government initiated criminal proceedings against Donald & Co. principals and employees, and in 2005 while those proceedings were pending.  The record also contains evidence that many of the criminals who participated in the pump-and-dump scheme had financial resources available to pay part or all of a judgment against them (e.g., the proceeds of the scheme, real property, and a boat).  In contrast, the record lacks any evidence that plaintiffs or their arbitration attorneys sought to determine whether they could actually recover their losses from the criminals involved in the pump-and-dump scheme by ascertaining the criminals' true financial conditions.  The record also lacks any evidence that the government seized, or planned to seize, the criminal defendants' assets or documents in such a way that would prevent plaintiffs from recovering their losses via restitution or otherwise.  And, the record lacks any evidence that in 2004, plaintiffs knew, or could have reasonably ascertained, the number of victims of the pump-and-dump scheme or the extent of those victims' losses.  In sum, absent objective evidence that plaintiffs had no reasonable prospect of recovering their losses in 2004, the court is foreclosed from relying on Mr. Adkins's subjective belief—premised on faulty assumptions—that the criminal proceedings in 2004 eliminated all of plaintiffs' avenues of recovery.  Although the court is sympathetic to plaintiffs' plight, plaintiffs have failed to marshal the objective evidence necessary satisfy their burden of proving that they had no reasonable prospect of recovering their losses in 2004.

In sum, plaintiffs have not established their entitlement to a theft loss deduction for the 2004 tax year.  Accordingly, the court **DISMISSES** plaintiffs' complaint **WITH PREJUDICE**. No costs.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge

-34-